secretary of the Department of Interior et al. v. David Bernhardt, e secretary of the Department of Interior et al. Good morning and may it please the Court, I'm Jonathan Hunter, and I represent W & T Offshore. This is the latest royalty dispute to come before the Court between the Interior Department and one of its offshore oil and gas lessees. While the issue is new, the Court's never considered before the legal consequences of Interior electing to receive its royalties in kind, its offshore royalties in kind. The Court's rulings in prior royalty cases provide the legal framework that controls here. So, for example, W & T's statutory argument that Interior's royalty payment decision contradicts the plain language of the OCS Lands Act relies on the type of statutory analysis by the Court in the two Royalty Relief Act cases, Santa Fe-Snyder v. Norton from 2004 and Kerr-McGee v. U.S. DOI from 2009. In both of those cases, the Court found that through a combination of plain language and reading the OCS Lands Act as a whole, the Royalty Relief Act was actually an amendment to the OCS Lands Act, the Court found that Interior's proposed interpretation in those cases produced results that negated Congress's unambiguous intent. And in both of those cases, the Court rejected Interior's effort to manufacture statutory ambiguity where none existed. And so here, it wasn't necessary for Congress to have gone into great detail about how to resolve in kind volumetric delivery imbalances. All that's important is to understand that Interior's statutory interpretation converts Congress's amount or value language into amount and value. And just like in those two Royalty Relief Act cases before, Interior's rewriting of Congress's language exceeds its statutory authority. Can they do one, one, sometimes, temporally, and then change? Absolutely, Your Honor. And that's an important point to make clear that's not in dispute, which is W&T does not dispute Interior's authority to change its election from receiving royalties in cash, which is the default methodology under the regulations. Interior is allowed to elect to change that, receive volumes in kind, and then it can change back to cash, and it can change back to in kind. It can do it as often as it wants. What's unlawful is their attempt here to do it retroactively. So what they've done is, after W&T completed its in kind deliveries, because Interior instructed them that they would no longer receive their royalties in kind, there was a delivery imbalance, as there always is in these in kind situations, and Interior ordered W&T to pay cash. So it's the meshing of the two. Yeah, it is a retroactive change in their election. They elected to receive in kind, and then they, yeah. I mean, and I have to say the briefing in this case is very good. This is a complicated issue, but it'll lay out your arguments very well. We're at Chevron step one here, right? Yep. So in order to agree with you, we would have to find that the language in the statute shows that Congress, it did not leave a gap for the agency to fill in here, right? With respect to, isn't that Chevron step one? That's essentially what the court means. The language just takes care of this problem about, we're going forward with in kind, and then there's a discrepancy, and Interior says we're going to make up for the discrepancy in cash. So a couple of responses, Your Honor. The first is that the OCS Lands Act is not silent on this issue. There's not a gap that says amount or value, and that feels, that prevents there from being any gaps. What gap that you say Congress unambiguously filled through the statutory language? Congress precludes Interior from retroactively changing its election so that for the same royalty period, for the same period of production, here was November 01 through September of 08, Interior is requiring W&T to pay royalties in amount, those were the volumes already delivered, and cash, which is what they've demanded now. So that's what has violated Congress's language. Is there anything else you can point to in the statute that would support that argument, that that's the only way to read the amount or value? So, as you know, Interior relies on Brian Garner, the ubiquitous Mr. Garner, and says that for the statute to have the meaning that W&T proposes, it should have said amount or value, but not both. Well, it doesn't say that, but the OCS Lands Act in other sections for other listing of matters that are, or items that are separated by or, does say sometimes this or that or both. And so the lack of the or both modification in the amount or value, it's our argument that that demonstrates Congress's intent. So it's the opposite of the Brian Garner. That's right. That's right. And, you know, Interior's argument backfires because when you start looking for a language like that in the OCS Lands Act, you see this or both construction in other sections of the act. Counsel, do, if we determine that it's a, the cash payment requirement for delivery shortfalls is a substantive rule change? I'm sorry, Your Honor, I'm not sure. If it's substantive? So, separately from the statutory. Going beyond the statutory, going beyond the statutory issue. Right. If you were to, assuming argument or you were to lose on your straight up Chevron step one. Right. And then they have articulated a reasonable rule under step two. We still have, you haven't conceded the case. That's exactly right, Your Honor. Can you get to that argument? Yes, sure. So, so even if the panel were to determine that Interior has the statutory authority to require a lessee like W&T to pay both in volumes and in cash for a single time period, Interior still has to comply with the APA. And the cash out methodology here is plainly a substantive rule. I mean, it, it checks every box that, that the case law tells you are the, are the signals of a substantive rule. If it's a substantive rule and they didn't comply with the APA, is that a render? Then where are we? Is that the? Yeah, what is the, what, what result? So, so their cash out methodology is unenforceable, even if they have the statutory authority. It's unenforceable. They can't make us pay cash. It's too late for them to promulgate regulations to deal, to deal with this. They are left with their original election to take royalties in kind. So what happens in this lawsuit? In this. You're talking about what the business situation is. What's the answer to the lawsuit? The answer to the lawsuit is either the court issues a decision agreeing with our statutory interpretation, or if the court accepts Interior's statutory interpretation, it declares Interior's final decision to be unlawful because it's based on a substantive rule. Is that the order to pay? Is that the, which one would be unlawful? What decision would be unlawful? So the, the Interior Board of Land Appeals decision upholding the orders to pay. So the, the substantive rule here is this programmatic, programmatic methodology that the agency developed after, so, so in 2008 or 2009, Secretary Salazar terminated the royalty in kind program. One fell swoop, terminated the whole thing. Is this a decision that sort of wipes away the dear operator letters? Yes. Approaching the dear operator, which were also cash, right? That's right. They were also cash. That's the one you're focusing on. We're going to wipe out those. That's right. And, and what they did was they developed this methodology internally without involving the regulated community and issued dozens of identically worded orders to operators like W&T telling them to comply with this new cash out methodology. So that's the rule. Judge Elrod, I'm not sure you quite answered that question. If we agree with you. Okay. Yes. If we agree with you, is the result in this, I mean, I assume it's a reverse. Right. But is it, is it practically you now owe them in kind? Yes. Okay. So we remand. You remand with them. So that it can be calculated under the other methodology. That's right. You remand with an order that, that W&T resolve its portion of the delivery imbalance by making one final delivery to the government. We still have to reach the equitable. I'm sorry. I got it. Yes, you do. So, so that's the question of, of how much would the, the delivery be, right? That final delivery. Do we reach that or do we send that back for somebody else to figure that out? So, so you don't sort of both. So, so the court has before it the issue of giving W&T credit for all of its deliveries over the relevant time period. The Interior Board of Land Appeals said that W&T was not entitled to credit for over deliveries made prior to February of 03. The district court held that that was unlawful and says that W&T is entitled to credit for those deliveries and the government has appealed that point. So, the court needs to decide, you know, the government's appeal of that point, which, which should be denied so that there should be an order resolving the case, remanding it for W&T to make one final delivery to the federal government giving W&T credit for all deliveries made in the 2001 to 2008 time period. So, is W&T still functioning? Yes. So, it would be able to complete the payment in kind? That's right. I mean, Your Honor, yes. That's right. They could go out and buy gas and deliver it, Judge. I mean, there's a lot of ways they could do it, but W&T has a lot of offshore production and could easily do this. So. Yes. Yes. One thing I, I neglected to say is that even if you get to Chevron Step 2, I would look at the Diamond Shamrock versus Hodel case from 1988. Back to the statutory issue. Yeah, back to the statutory issue. I just did, I just wanted to make sure I covered that because in Diamond Shamrock, the court said that the royalty issue raised, this was about royalties on take or pay payments, was not remotely addressed by the statute in any sort of specific way, and yet it found that the plain meaning of the term production meant that Interior's claim was, was unenforceable. And the court applied a standard of, the court said, okay, we're going to see if the agency's reading of the statute is permissible. And the court decided that it was not. And it was a very sort of practical analysis of, of, there it was, our clauses amount or value, the whole clause is amount or value of production. In that case, it was what is the value of production. So it's, it's, you know, right in the neighborhood. And just because if you were to get to Chevron step two, that doesn't mean we lose. Because if you look at Diamond, Diamond Shamrock, we've got plenty of authority. Why do you care if you're going to use the money to buy the gas to settle the problem? Why don't you just pay the cash? Why are we having all this problem? I was just addressing, you know, sort of the practical, you know, you, Your Honor, you're right, we're still viable. And that's all I was saying. What we owe them is gas. That's what they, that's what they elected to get. And that's what we, that's what we owe them. I mean, that's the. I mean, I don't know. Practical question? The question is, what difference does this make? Whether or not it's in gas kind or is it, it's a different amount because their calculated amount for the cash is higher than what you believe the gas would cost? That would be, that would be the case. It's a significant amount of difference. Yes. But it would be the value of the gas. I don't see why that would be a difference. But the value of the gas today versus some amount that they've calculated? Right. That's right. What's the, how much money are we talking here? Their order, their order to pay, their orders to pay plus interest at the time was about 2.4 million. 2.4. 2.4 million dollars at the time. And, and how much is it worth? You have to get through all of the, the steps regarding volumes to figure out what exactly W&T owes in volumes and then you would. So if we were to make, obviously if we were going to make that delivery next month, it would be based on, on current prices, which are, which are less than the prices at the time. Current prices are less than the prices that the government used. That's right. How much per, per unit? It's maybe, it's less than half, I would say. Less than half. Okay. I mean, but if we were to go the route of saying, no, no, cash is fine, there's a disagreement on how to calculate the cash amount, right? Yes. Whether it violates the reg. Right. There's also a disagreement on, on interest. So they've waived on interest. They've waived on interest. Okay. That's right. Assuming it's true. But there's also, aren't there a bunch of other cases? I don't know if it's a bunch, but aren't there a bunch? There are, yeah. This is a test case. That's right. So there are, Interior issued dozens of these orders. W&T happened to be the first company to get through the administrative appeal process and to federal court. These other appeals have been stayed pending the outcome of this. So there are, across the industry, there are tens of millions of dollars at stake in this issue. So we're the tail wagging the dog at this point. No, we're the dog. We're the dog. Okay. I'm out of my time for now. I'll reserve for Roboto. Okay. Thank you, counsel. Thank you. I appreciate your helpful explanation. And we should know that the opposing counsel will give one as well. May it please the court, my name is Michael Gray. I'm here on behalf of the Department of the Interior. I think it's instructive, the last colloquy about why we're here. Interior is here to attempt to square things up and recoup the value of the royalties that were due to the American people on one of the American people's most valuable assets. You heard from W&T's counsel that they're here because the price of natural gas now is less than half of what it was when they should have delivered it, which would save them an incredible amount of money. Now, the money that would, of course, not go to the American public. Briefly on the statutory issue, I do think it's clear that it encompasses Interior's responsibility here to collect this money, and not just in the amount or value. This is, of course, value, what they're seeking on unpaid, undelivered royalties. So that covers it right there, square away, but also the rest of the statute, which authorizes Interior to take appropriate actions to make additional collections without restriction and requires lessees to pay in the time and manner specified. And given that full statutory context, I think the authority given to Interior here under the statute to make these collections of underdelivered royalties is clear. I'm sorry, Mr. Gray. On the statutory point, amount or value, I'm struggling with how to articulate the right Chevron step one question. It's not helpful to me just to say, oh, is it ambiguous or not? I think the Supreme Court has given us a little bit more guidance on that and said, well, did Congress, through its use of this language, really leave nothing for the agency to fill in? And as I understand it, what's going on here is that there are royalties that were, at some point, were being in-kind, the RIK program. And then, at some point, the Interior said, and I think counsel opposite agrees that you have this authority to say, okay, we're going to stop that. We're going to move to value. But with respect to discrepancies on a royalty that was being collected in-kind, Interior now wants to say, well, now we want to make up for that discrepancy with cash, right? And that's the question here. And they say you don't have that authority under the statute to do that with respect to a particular lease. Do you think the language unambiguously gives you that authority, or is it ambiguous and you have to sort of fill in the gap as an agency? Well, I think we win either way, but I think it's unambiguous. I think it's unambiguous. You think you win at step one. I think we win at step one because step one includes not just the amount or value provision, step one of Chevron includes all the relevant statutory context. And in the relevant statutory context, it's clear that Congress gave the authority to Interior to, as I said, take appropriate actions. And the question is, is this an appropriate action? And what they're collecting is something in value. They're not collecting a third thing here, right? They're collecting something in value. What they're going to say on rebuttal is, well, they're going to – well, I lost my train of thought there. They're going to say appropriate action has to read back to, well, are you actually authorized by the specific statutory provision, and that's amount or value. And if you go on beyond that, it's not appropriate. I want to emphasize that their argument really proves too much, which is why they run from it. This is why they say, well, yeah, in any given month, sure, you can make an election. But the statutory provision itself just authorizes Interior to have a bidding system that says you bid based on a cash bonus bid plus a royalty and amount or value. If they're right, there's no limiting principle in that provision to what they say. Well, only when it's the same period does Interior not have the ability to do one or the other. But why? They've never explained where in the statute that comes from, why in the world Congress would adopt that regime. Isn't it a problem that this particular statute doesn't say amount or value or both? No, I don't think that's a problem at all. I mean, if you – there are statutes certainly that say or both. Congress also, if you do a – Doesn't this statute say or both in other provisions? In some other provisions where Congress thought more clarity was necessary. But if you just do a simple Westlaw search, you'd return numerous instances where Congress also includes the words but not both where clarity is needed. This statute is what we need to look at. Yeah, sure. This is – that's the point. This statute is what we need to look at. Why do they say or both when they mean or both? Well, I think when they say or both is when Congress decided that more clarity was needed. I mean, here you have an authorizing provision, and they don't even accept the full weight of their argument that if you credit that Congress had to say or both, then Interior would have no ability to switch back and forth. They've never been explained why there's a line there other than that it's convenient for their argument in this case. Wouldn't it make sense that the shortages, if they were due two years ago, at that point they were due in kind. Okay, well, they're overdue now. So I think what they're saying is, well, you can't just now all of a sudden say something that was due in kind in the past is due in cash now because it makes more money for you. Would you agree that you could establish a rule where if something is changed from in kind to in cash, it would have to be for what is prospectively owed or what is immediately owed rather than in the past? No, I mean, I think you're getting a situation where we're trying to game the system by making a change. The difference is here they had an obligation to deliver. I'm sorry, excuse me. Opposing counsel said it would be half the value which would give you half of what you're looking for. Well, and not just half of what we're looking for, but half of what they owed at the time. And the reason it's half the value is because they failed to make the deliveries. And I think there's a practical point here that maybe hasn't come out yet today or in the briefs, which is that when the agency ended the program, the third party contracts it relied on to have the program all expired, the infrastructure all expired, so it's not just a matter of the agency. Well, now we can take the gas in the first place. You'd have to have an authorization to restart the program. You'd have to have all new service contracts for transportation and processing and a whole infrastructure that's not in place. And so part of what the agency was doing here, and this really goes if there is some ambiguity and has the agency adopted a reasonable approach, is the agency's saying we've ended the program. You had the full life of the program to make up these deliveries. In fact, the way the program was supposed to work was you're going to make rolling deliveries. If you under-deliver in one month, the next month you were supposed to do it. If 120 days went by, then you have to set up a system with Interior to do it or pay a cash-out. And it didn't work that way. They didn't do it. And now we're left with a program that's ended, not the infrastructure to accept the payments, and the American people not having received the value of the royalties. You can't physically deal with payment in kind at this point. Right. It would require a major administrative action to deal with it. I don't think that that particular point is brought out well in the record. There is some things about expiring contracts in the record that you can glean from it. To me, though, that gets into the substantive rule problem. Because if you've ended the program and so now you have a new regime, which you're basically saying you didn't comply with the APA, not you personally. Thank you. Can you help us there? Yes. Because that, to me, seems like the more difficult problem for the Interior in this case, even if we were to accept you under Step 1 or Step 2. I'm happy to do that. And I think what you see is that the orders to pay are a quintessential informal adjudication. There was a problem here. The problem was we have underdeliveries of royalties. There was a dispute about how to do it, and the agency had to decide how much for each. It came out in the other times there are more than one of these cases, right? For each one. In this case, this is not a substantive rule. I'm not sure. I'm not sure about a best case on that. I think mostly this court's case law is Phillips and Shell Oil, neither of which are particularly helpful for us, but I do think they're distinguishable. I do want to be sure to distinguish those.   I do want to be sure to distinguish those, because... Let's talk about that. So not best case, but best principle is in the language of the statute of the APA itself, which says that rules have to have future effect. Okay? And so Phillips and Shell Oil both involve situations where the pronouncements had future effect. So in Phillips, for example, you know, Phillips dealt with... The, you know... You had a system in place to calculate the value, and then they said, we're gonna use this other method going forward. They required people to recalculate royalties that they'd already paid, which is different than the situation where we're just seeking royalties that haven't been paid. And Phillips said, well, you've adopted a new regime going forward that you're applying here. That's different. Is that what you just told us, though? No, that's... You've adopted a new regime going forward because you no longer have the ability to accept payment in kind. No, Gisela. What we did here was resolve past things in an adjudication. Past thing being the discrepancy. The discrepancies. We were owed royalties. We didn't get them. The program's ended. Now what do we do? What's... How do we resolve it? How do we calculate what's due? That's the problem. That's an adjudicatory problem. And Phillips, they're changing the way that they're going to do it. And Shell Oil, they said, well, we used to think this FERC thing was good enough, but now we want proof from FERC going forward for everybody going forward. The agency was free here. Even in these, it never adopted a policy. They point to the dear operator letters and the IBLA decision, but there was never any formal adoption of any... or informal adoption of any policy that said we have to do it this way. The agency was free on particular facts, if any arose, to accept in kind. It would be free if it restarted the program to accept reconciliation in kind. What the agency said, in this particular situation is resolving a very particular situation. In this particular situation, we're going to adjudicate this to require a payment to make it up. Do you agree that the agency, before sending the orders to pay, agreed on a uniform methodology and then, which was incorporated in the orders to pay that were then sent to people like W&T? I think the agency certainly developed what it thought the right way to do it was, yes. Uniform, right? I'm not aware of any situations in which the agency did something different, but that doesn't mean that the agency wasn't free to do something different. Remember, these are orders to pay and then you have an adjudication through the IVLA. If there were particular circumstances through that, that the agency would have been free in those circumstances or in just communication with the... I guess my point is it seems like I think this is the argument on the other side. It seems like the agency decided here's how we're going to do it. And same across the board. All the orders sent, same. Well, because all the facts were the same. I mean, there really is a, you know, the line between these things is very blurry. At the granular level, right? Yeah, sure. And the agency has to adjudicate that. That's why, I mean, the result is an order. There's a prior step also in adjudication where we say, okay, we're going to figure out how to do this. And when this court announces a new rule, it's not legislating any more than when the agency decides how it's going to adjudicate particular cases. It's not doing a legislative rule. The fact that if there were only one, I mean, there could have been only one. You don't legislate. There could have been only one, right? Had there been only one, then we wouldn't say, well, the agency adopted a new rule. The fact that there was more than one doesn't change what the agency did. I mean, it's good agency policy to adopt a consistent practice. I mean, that doesn't transform what the agency's doing into a rule. Well, you said that the distinction between Phillips and Shell had to do with future effect. Yes. Could you elaborate on that? What does that mean, future effect? If you look at cases where courts say, this is a substantive rule, they almost uniformly involve some situation where the agency at some point says, we're going forward, this is how everyone shall be treated. And here, this was not a going forward situation. This was, this is how we're going to resolve the imbalances that exist. And that is a backward, that's adjudicatory. That's different than saying, from now on, we're going to calculate in this particular way, not the other way. Or in saying, like in Shell Oil, from now on, you have to come to us. Do you have a case that draws that distinction between future and backward looking? I mean, there may not be a case. I don't know. There are. I'm not sure I have it right at my fingertips right now. You know, well, I mean, Devon Energy, the DC Circuit cases rely on the Devon Energy case and the Amico case. Both, you know, they rely more on the binding effect from the author, but they do talk about the reason that matters is because it has to have future effect. I get it. So, but you mentioned binding effect. Is your argument that the deer operator letters weren't binding? Well, they weren't binding on the agency. In fact, I mean, if you look at the history, they didn't much treat them as binding. I mean, if you look at the history here, the way the deer operator letters set out the way this was supposed to work was that if you had an imbalance, you had 60 days to identify it, then you had a month to make it up. And if you hadn't made it up in 120 days, you worked with Interior on a delivery schedule or a cash out payment. But, you know, neither the agency nor the regulated community really followed that religiously, which is why you have these cases at the end of a seven-year period that end up with, you know, these huge amounts of imbalances that the agency was, had to deal with. So, no, I mean, I don't think those, they were not signed by authorities with officials with the authority to bind the agency. So, no, I don't think those... Well, I mean, they're sent to administer the program and, you know, the agency operates this way routinely. I mean, that's the same sorts of letters that were involved in Devon Energy and Amico production. All the letters are in the past? Yeah. Okay. Even though the program is still, is now in the natural resources section and more organized? Am I wrong on that? That it's, that there's an organized... There's been an organizational shift within Interior, yes, but there's no, I mean, there's no in-kind program at this point. The Secretary, you know, stopped it in 2009, so there's not, there's nothing going on with respect to that program within Interior. It did do rulemaking with respect to value, right? It did and, you know, I don't know for sure the answer about why they didn't engage in rulemaking and I think part of the  was, you know, as they were, you plan this out, you're seeing how it works, you're seeing what the rules should be going forward and then, you know, they ended the program so there was no, ended up being no need to adopt the rules. I mean, the program only lasted, you know, eight years and, you know, they didn't have a need to adopt the rules and they didn't have the need to adopt the rules and they didn't have a need to adopt the rules and then they were given less than the requirement to adopt the rules and they didn't have the need to adopt the rules and they didn't have the requirement to adopt the rules and they didn't have the need to adopt     didn't have the need to adopt the rules and they didn't have the requirement to adopt the rules and they weren't able to     they didn't have the requirement to adopt the rules and they didn't have the requirement to adopt the rules and they weren't able to adopt       the requirement to adopt the rules and they weren't able to adopt the rules and they weren't able to adopt the rules and they weren't able to adopt the rules and they weren't          to use the rules and they weren't able to implement the rules and they weren't able to make the rules   weren't able to   rules and they weren't able to implement the rules and they weren't able come up with new methodology and you have to understand it was different than expected before and they will apply it to resolve past unbalances so this is Shell versus Babbitt Phillips the exact same thing. The next slide shows the cases interpreting an ambiguous regulation. That's the problem here. They didn't come out with any regulations. They started to draft them. That's what they told the general accountability office of Congress. They said we recognize we need regulations and we have started drafting them. They imposed it on industry. They can't do it if it's substantive. They can't. You can't be wrong about the determination but they can switch to saying we're not going to do regulations if they believe it's not substantive. It's not really what they believe. It's whether it is substantive or not. The case law says it's substantive if it fills in gaps. It's substantive if it legislates. The statutes don't say anything about this which is effectively an admission that this is a substantive rule. It's substantive because it's binding on the regulated community. They said if you don't pay like this you're going to get civil penalties. They treated it as binding on the regulated community and the regulators themselves. No one could do anything different from this once they adopted it. It's binding because any time an agency looks and says we can do this this way or this way and they pick one of them, that choice among alternatives is a substantive rule. The regulated community    regulated community and the regulators themselves. So again, Devin and Amico categorically different because they involved interpreting a regulation. Does the court have any questions about the fair notice doctrine, the equitable recoupment doctrine? I read the briefs on the points. These are very good on this. Let's see. In conclusion, I would say this. The Department of Interior ran a multi-billion dollar program without coming up with rules and it changed the rules retroactively and it has exceeded the authority that Congress gave it in the OCS Lands Act and the Administrative Procedure Act. It has violated the equitable recoupment doctrine and a variety of other statutes. Thank you. We appreciate the preparedness of both of you. Thank you.